**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
MICHELLE CUMMINGS-FOWLER,

                              Plaintiff,        **MEMORANDUM OF**
                                                   **DECISION AND ORDER**
            -against-                  **09-CV-3593 (ADS)(ARL)**

SUFFOLK COUNTY COMMUNITY
COLLEGE, JAMES CANNIFF and RICHARD
BRITTON.
                              Defendants.
---------------------------------------------------------X

<u>**APPEARANCES:**</u>

**LEEDS MORELLI & BROWN, P.C.**
*Attorneys for the Plaintiff*
One Old Country Road
Suite 347
Carle Place, NY 11514
        By:    Rick Ostrove, Esq.
                Andrew George Costello, Esq.
                Thomas Ricotta, Esq., Of Counsel

**CHRISTINE MALAFI, SUFFOLK COUNTY ATTORNEY**
*Attorney for the Defendants*
H. Lee Dennison Building
P.O. Box 6100
100 Veterans Memorial Highway
Hauppauge, NY 11788-0099
        By:    Christopher M. Gatto, Assistant County Attorney

**SPATT, District Judge**.

        On August 19, 2009, Michelle Cummings-Fowler (the "Plaintiff") commenced this action

against her former employer, Suffolk County Community College ("SCCC"), and her former

supervisors, James Canniff ("Canniff") and Richard Britton ("Britton") (collectively, the

"Defendants").  The Plaintiff brings claims for hostile work environment, discrimination and

retaliation pursuant to 42 U.S.C. § 2000-e ("Title VII") and 42 U.S.C. § 1983 ("§ 1983").  In this

regard, the remaining claims in this action are (1) a § 1983 claim brought against Canniff for allegedly violating the Plaintiff's constitutional rights under the Equal Protection Clause by participating in a discriminatory hiring decision; (2) a § 1983 claim brought against Britton for allegedly violating the Plaintiff's constitutional rights under the Equal Protection Clause by subjecting her to inappropriate racist comments; and (3) a Title VII and § 1983 claim against SCCC for alleged discriminatory hiring practices, hostile work environment and retaliation.

Presently before the Court is the Defendants Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56 motion for summary judgment. For the reasons that follow, the Defendants' motion is granted in its entirety and this case is dismissed.

## I. BACKGROUND

### A.  The Alleged Hostile Work Environment

The Plaintiff is an African-American woman who was forty-five years old at the time this action was commenced. In 1997, she was hired by SCCC as an adjunct faculty member. Thereafter, in February of 2000, the Plaintiff was promoted to the full-time faculty, and in February of 2003, the Plaintiff was promoted to the position of Coordinator of Instructional Development. With respect to her education, the Plaintiff received an associate's degree in applied science from SCCC in 1983; a bachelor of science degree in management information systems from SUNY Old Westbury in 1985; a master's in business administration degree from Dowling College in 1987; and a doctorate degree in education administration from St. John's University in 2007.

While employed by SCCC, the Plaintiff received positive evaluations from supervisors and never received any negative reviews. Also, in 2008, she was nominated for the State

University of New York ("SUNY") Chancellor's Award for Excellence in Professional Service. Her nomination was supported by letters of recommendation from colleagues at SCCC, who recognized her professional achievement as a member of the faculty and her contributions to SCCC's Distance Education and Instructional Technology program.

During her time at SCCC, the Defendant Canniff served as Vice President for Academic and Student Affairs from 1997 until 2010 and also headed the Office of Instructional Technology, the department in which the Plaintiff worked. According to the Plaintiff, Canniff commonly referred to African-Americans as "you people." For example, the Plaintiff claims Canniff referred to the Black Faculty Association as "you people," stating that "'[y]ou people' have scheduled her to attend her meeting." She further alleges that when Canniff was scheduling a meeting with Dr. Randolph Manning ("Manning") an African-American man, he said "[w]hen 'you people' get it together, let me know."

In addition, Canniff apparently appeared incredulous that the Plaintiff completed her doctorate degree program at St. John's in three years, insisting that there was no way she could have finished in that amount of time and suggesting that she bring him an official transcript so he could review it. Allegedly, Canniff's attitude was significantly different when he learned that a white faculty member had completed her doctorate in three years. Moreover, the Plaintiff claims that while Canniff referred to white colleagues by their professional titles, he continuously called her "young lady" or "Michele" instead of her professional title.

The Plaintiff complained of Canniff's behavior to the Defendant Britton, who from 2003 to 2013 served as the Associate Dean for General Education and who acted as the Plaintiff's "mentor" during the College's Leadership Academy. His office was located next door to the

Plaintiff's office.  With respect to the Plaintiff's complaints that Canniff called her "young lady," Britton purportedly told her to "just let it go" and then, according to the Plaintiff, "launched into a racist rant."  (Pl. Opp., pg. 5.)  In this regard, Britton allegedly said that "[y]ou people are just taking over" while referencing SCCC's President, Vice President and two executive deans, all of whom were African-American.  In response, the Plaintiff questioned Britton about whether he liked anyone of color, to which Britton replied that he liked Yvonne Walters and Manning, since Britton felt he was "one of them" even though he "looked like you people."

On another occasion, when Michele Green ("Green") was promoted to assistant dean, Britton allegedly stated "Well, she is smart.  She just happens to be black."  Furthermore, when the Plaintiff and Britton discussed their upbringings in Mount Vernon, New York, the Plaintiff explained to Britton that when they moved in, everyone moved out.  The Plaintiff claims Britton replied "oh, yeah, we got the hell out of there."  In addition, when Joanne Braxton ("Braxton") was promoted to a new position as a vice president, Britton apparently told the Plaintiff that she was not going to be able to go anywhere professionally because Braxton was "a fat black woman" while the Plaintiff was "a skinny black woman" and that Braxton would not want an attractive, thin black woman "on her turf."  Lastly, according to the Plaintiff, Britton constantly made negative comments about Shirley Pippin ("Pippin"), who was an African-American woman and the President of SCCC.  These alleged derogatory statements suggested that Pippin was full of it and that it was time for her to go.

The Plaintiff also complained to Manning about the alleged racist remarks.  At the time, Manning was the Interim Dean of Instructional Technology.  Manning usually shook his head in disgust and, on one occasion, when the Plaintiff told him that Britton had referred to him as "one

of us," he responded by saying "Does he know I grew up in Gordon Heights and I'm a black man?" Nevertheless, Manning apparently took no action to investigate the Plaintiff's complaints.

The Plaintiff asserts that Britton's and Canniff's comments and attitudes made her feel demeaned, humiliated and less equal that her white peers, as well as put her in a position where she thought she had to constantly prove herself. Moreover, they caused her to apparently have anxiety attacks, which would occur when she had to be in the company of Britton and Canniff during events at SCCC. Due to Britton's and Canniff's comments, she claims she passed on promotional opportunities because she thought her prospects were diminished.

However, SCCC had an Anti-Discrimination Policy and Grievance Policy for Employee Claims of Discrimination by Another Employee, Guest or Contractor (the "Policy"), which had been adopted by SCCC's Board of Trustees in 2003. In relevant part, the Policy provides:

> The College will not tolerate discrimination on the basis of race, national origin, color, religion, sex, age, sexual orientation, disability, marital status, military status, domestic violence victim status or any other status prohibited by law. Whenever an alleged violation of this policy is brought to the college's attention, an investigation will be undertaken and, if a violation is found, prompt and corrective action will be taken. All members of the college community should contact the appropriate college office, as set forth below, if they believe a violation of this policy has occurred.

(Bergen Aff., Exh. C.) The Policy directed that a faculty member complaining of discrimination by another faculty member should submit her complaint to the Office of the Compliance Officer or the Office of Human Resources. Additionally, under the policy, discriminatory practices include retaliation for filing a charge of discrimination, participating in an investigation or opposing discriminatory practices. The Policy calls for a thorough investigative process for an

employee's discrimination or retaliation claim, which includes the reporting of a Complaint to a Compliance Officer or the Human Resources Department, investigation, determination of sufficient cause and appeal to SCCC's president.

Nevertheless, the Plaintiff never reported a complaint in accordance with the Policy. As such, no internal investigation was ever conducted. However, according to the Plaintiff, SCCC was on notice and should have taken action, because she had complained to two Deans, Britton and Manning.

## B. The Alleged Discrimination

In January 2006, SCCC submitted a report to the Middle States Commission on Higher Education, which is a college accreditation committee. In the report, SCCC indicated that one of its goals was to increase the number of doctoral-degree holders among its faculty, stating the doctoral degree was the preferred qualification over the master's degree, which was only a requisite minimum qualification for instructional faculty. Moreover, with respect to its faculty-diversity-hiring plans through the year 2010, SCCC represented that ninety percent of its faculty identified themselves as white or Caucasian. Therefore, SCCC hoped to engage in efforts to increase faculty diversity by having twenty percent of its new hires reflect a broadening of the faculty's diversity.

In early October 2007, SCCC advertised to fill the position of Associate Dean of Instructional Technology. A search committee of nine members was formed to make a hiring recommendation for this position to Canniff, who would then proceed to recommend a candidate to SCCC's president, who, in turn, would make the final hiring determination. Dr. Ashberine Alford ("Alford"), SCCC's Dean of Faculty, chose the members of the committee and Douglas

Kahn ("Kahn") was selected as the committee's chairman. Of the members of the committee, only one, Green, was African-American.

The Associate Dean position focused on distance education and required a master's degree, although a doctorate degree was noted on the advertisement as being preferred. In this regard, the minimum qualifications for the position were listed as follows:

> The successful candidate will have a master's degree (doctorate preferred) in information technology or related area; a record of distinguished leadership in the information technology sector; ability to implement and oversee advanced and emerging technologies, including distance education; demonstrated ability to lead through collaborative and shared decision making and the ability to sustain strong and collegial relationships with faculty, staff, students and administrators.

(Canniff Aff., Exh. A.) However, the committee agreed that a candidate who possessed a doctorate was not necessarily more qualified than one without such a degree, provided that candidate was otherwise qualified for the position. All the candidates were required to submit official transcripts in connection with their application.

The Plaintiff submitted her application for the position in the same month SCCC advertised for it, October 2007. Thereafter, in November 2007, the committee met and immediately eliminated ten candidates because they did not meet the minimum qualifications. Among the candidates that did meet the qualifications were the Plaintiff and Steve McIntosh ("McIntosh"), a white male. In this regard, as stated above, the Plaintiff had a doctorate degree in education administration in leadership and accountability, with an emphasis on instructional technology, from St. John's University, had worked in distance education at SCCC for five years and was in the SCCC's Leadership Program. She also had a master's degree in management.

McIntosh held a master's degree in corporate communications, but did not have a doctorate degree. Rather, he was in the process of earning his doctorate degree in humanistic studies, with a focus in organizational communication, as well as educational theory and practice. He anticipated completing the doctoral degree by the spring of 2008. Further, he served as the chair of Faculty Access for Computing Technology ("FACT"), which was the only faculty committee that reports directly to the SUNY Provost. In addition, he had worked as both an Adjunct Instructor and as the Coordinator of Instructional Technology at Schenectady County Community College, where he was in charge of distance education.

The committee met a second time and used a scoring sheet to reduce the candidate pool to five candidates who would be invited to interview. During this second meeting, the committee noted that the Plaintiff's cover letter had multiple grammatical and spelling errors. For example, the Plaintiff wrote "I have also written several proposals for this program including the proposal for the peer mentoring program and assisted in the proposal a course [sic] in all the modality of distance learning." (Canniff Aff., Exh. C.) The Plaintiff also wrote "I teach 2 courses on line and administrator [sic] the program as well as assist faculty with development, design and pedagogy." (Canniff Aff., Exh. C.)

In addition, the Plaintiff began the second paragraph of her cover letter with the following run-on and error-ridden sentence: "During my tenure in this position have had [sic] the opportunity to work with several [sic] Associate Dean of Instructional Technology, this position due to position [sic] being vacant four times during my tenure, to my advantage has allowed me to grow administratively in this department and to understand the mission and vision of distance

education within Suffolk County Community College." (Cannif Aff., Exh. C.) The third paragraph of her cover letter contained similar grammatical problems:

> I am a member RFP [sic] committee [sic] for a new Course Management System, Title II Task force [sic] Committee, the Distance Education Committee, Middle States sub-committee, Senate, Academic Standards [sic], Senate Executive Council, Sexual Harassment [sic], class size [sic], Graduation Committee [sic] and served on several search committees as well as chairing two search committees. This position [sic] as well as a member of the academic standards committee [sic] has allowed me to work with the Associate Dean of Instructional Technology on the preparation and accuracy of the college catalog, assisting [sic] the dean with the budget for the department, and strategic planning.

(Canniff Aff, Exh. C.)

The Court notes that because the Defendants did not include with their motion for summary judgment McIntosh's cover letter, the Court does not know whether McIntosh's cover letter also had errors. However, there were minor mistakes in McIntosh's resume, such as failure to explain abbreviations and inconsistent use of periods, oxford commas and italics. With respect to other errors that the Plaintiff points out, like the use of colons and semi-colons, the Court does not find them to be grammatically incorrect.

Although the committee was alarmed by the errors in the Plaintiff's cover letter, they nevertheless invited the Plaintiff in for an interview. McIntosh and three other candidates were also asked to interview for the position. All five finalists were interviewed on February 1, 2008. During her interview, the Plaintiff was asked about her experience; the position for which she applied; her experience at SCCC; and how she thought she would be an asset if she was given the position. Once the interviewing was completed, the committee narrowed the finalists to just the Plaintiff and McIntosh. The committee then held a secret ballot to rank the Plaintiff and

McIntosh. As the chair of the committee, Kahn recused himself so that he could cast a vote if there was a tie. By a vote of 7 to 1, the Committee ranked McIntosh first and the Plaintiff as second. According to the Defendants, race was not discussed during the committees' deliberations.

The Defendants claim that the committee based its decision to recommend McIntosh over the Plaintiff primarily on McIntosh's academic credentials and work experience. In this regard, allegedly the committee particularly valued McIntosh's direct work experience with the SUNY Provost as a result of being the chair of the FACT committee. They also valued McIntosh's experience as Coordinator of Instructional Technology at Schenectady County Community College, where he was in charge of distance education.

Conversely, according to the Defendants, despite the Plaintiff's doctorate, the committee felt that the Plaintiff lacked McIntosh's level of proficiency in the area and networking contacts. They also remained especially concerned about the mistakes in the Plaintiff's cover letter.

On February 2, 2008, Kahn forwarded the committee's recommendation to Alford and Canniff. Thereafter, on March 20, 2008, at the direction of Canniff, Manning was considered and interviewed for the position of Associate Dean of Instructional Technology. However, after the interview had been completed, the committee unanimously decided that it would not recommend Manning for the position and reaffirmed its recommendation that instead the position should be offered to McIntosh. Kahn presented to Canniff the abovementioned reasons for why the committee chose McIntosh over the Plaintiff. The Defendants claim that Canniff then reviewed the candidates' resumes and interviewed them. He concluded that McIntosh was

more qualified for the position, agreeing with the committee's recommendation. Eventually, after the SCCC president approved, the position was offered to McIntosh.

On April 8, 2008, at the request of the SCCC President, the College Associate Dean for Educational Resources, David Bergen ("Bergen") reviewed the search process for the position of Associate Dean of Instructional Technology. The SCCC President had asked for the review because Manning had expressed dissatisfaction with the process. In connection with his review, Bergen interviewed the committee members, Canniff and other employees of SCCC. Upon completion of his review, Bergen concluded that the search process was fair and that there was no complaint of discrimination as to any aspect of the search process. The majority of the committee members had told Bergen that they chose McIntosh for his extensive connections to others in the SUNY system with regard to information technology and his vision for the future. Committee members also apparently weighed heavily the many grammatical errors found in the Plaintiff's cover letter, believing that exceptional written skills was a standard requirement for any associate dean at SCCC. Lastly, Bergen considered whether it was appropriate to allow Manning to interview for the position even though the committee had at that point already completed its search process. In this regard, Bergen found that the integrity of the search process was not compromised on the ground that the committee could only make recommendations for the position.

When Kahn called the Plaintiff on the telephone to notify her that she did not receive the position of Associate Dean of Instructional Technology, apparently the Plaintiff experienced chest pains and was hospitalized. Afterward, while recuperating at home, the Plaintiff contacted her union grievance officer, who informed her that Canniff was allowed to hire whoever he

wanted for the position. According to the Plaintiff, Green told the Plaintiff that she thought the committee was racist and that she felt they were too concerned with the mistakes on the Plaintiff's cover letter.

On April 21, 2008, the Plaintiff filed a complaint with the New York State Division of Human Rights. On May 21, 2009, the Plaintiff received her right to sue letter and on August 19, 2009, the Plaintiff filed this action. On September 9, 2009, SCCC was served with the Complaint.

## C. The Alleged Retaliation

On the morning of April 12, 2009, while the Plaintiff was at home with her daughters and her husband, Darryl Fowler ("Fowler"), he was verbally and physically abusive to the Plaintiff and her daughters. The police were called and responded to the scene and investigated. Following the police's investigation, the Plaintiff and her daughters left the home and went to stay with at the home of the Plaintiff's mother, which was located less than a mile away. However, one of the Plaintiff's daughters realized she had left her contact lenses at the Plaintiff's house, and so the Plaintiff went back to the home to retrieve them.

On her way, the Plaintiff passed Green's home, as Green lived in the same development. The Plaintiff stopped at Green's home and asked Green to accompany her, because she was afraid that Fowler would assault her if she returned to the house alone. The Plaintiff explained to Green about her fear and about how Fowler had behaved abusively toward her earlier that day. Green agreed to accompany the Plaintiff to the house. While they were at the house, Fowler arrived and he and the Plaintiff engaged in a verbal altercation, which Green witnessed. Once again, the police were called.

The following day, April 13, 2009, the Plaintiff obtained a Temporary Order of Protection (the "First Order") against Fowler from the Suffolk County Family Court. That same day, the Plaintiff called Green to tell her about the First Order. One week later, a Second Order of Protection (the "Second Order") was issued by the Suffolk County Family Court, forbidding Fowler from assaulting, stalking, harassing or menacing the Plaintiff. By June 2009, Fowler and the Plaintiff no longer lived together in the same home, as Fowler had moved out of the marital residence. The Plaintiff had also commenced divorce proceedings.

However, on September 28, 2009, Fowler kicked in the door of the Plaintiff's house. The Plaintiff called the police and Fowler was subsequently arrested. The Plaintiff then went to the police station to make a statement. While there, she saw Green, who was at the police station to pick up Fowler at his request. The Plaintiff told Green that Fowler had kicked in the door to her house. On the following day, September 29, 2009, the Plaintiff obtained a third Order of Protection (the "Third Order"). The Third Order was issued by the Suffolk County District Court and ordered Fowler to cease all communications with the Plaintiff and to stay away from both her home and place of work. Either one or two days after it was issued, the Plaintiff told Green about the Third Order, including its requirement prohibiting Fowler from going near the Plaintiff's home or workplace.

Despite these occurrences, on September 28, 2009, the same day Fowler had kicked in the door to the Plaintiff's house and had been subsequently arrested, Green had hired him as a part-time test proctor at SCCC. In this regard, Green informed Fowler about the position; told him who to contact to apply; and eventually approved his hiring. Fowler was hired to start on October 5, 2009 on an as-needed basis. On the date he was hired, September 28, 2009, SCCC

claims that no order of protection involving the Plaintiff or Fowler was on file with the Human Resources department and the Plaintiff had not yet obtained the Third Order.

The Plaintiff did not become aware of Fowler's hiring until early October 2009, when Fowler called her and informed her about it. The Plaintiff then called Green and questioned her about why she would hire Fowler knowing that the Plaintiff had obtained an order of protection against him. At first, Green told the Plaintiff that she did not hire Fowler, but rather just told him about the opportunity. Yet, when the Plaintiff further questioned her, Green grew quiet and stated that Fowler had helped her a lot with her house.

According to the Plaintiff, on October 15, 2009, she spoke with Paul Minot ("Minot"), the campus security officer. Minot was aware that an order of protection had been issued against Fowler. Minot informed the Plaintiff that Fowler had been processed for employment with SCCC. After speaking with Minot, the Plaintiff apparently reached out to the head of campus security, John Williams ("Williams"). The Plaintiff explained to Williams about Fowler; their pending divorce; and the Third Order. In addition, the Plaintiff told Williams that Fowler had recently violated the Second Order and that she was fearful of him. Williams instructed the Plaintiff to fax him a copy of the Third Order and assured her that he would take care of the situation. The Plaintiff faxed the Third Order to Williams.

Also on October 15, 2009, the Plaintiff claims she spoke with the Assistant Vice President of Human Resources, Doriane Gloria ("Gloria"). Specifically, the Plaintiff told Gloria that Fowler had recently been hired by SCCC although there had been three orders of protection issued against him. She informed Gloria that Fowler had just violated the Second Order and that she was frightened of him. Allegedly, according to the Plaintiff, Gloria replied that she did not

think it was a big deal, since Fowler only had to be fifty feet away from the Plaintiff. However, the Plaintiff pointed out to Gloria that the Third Order actually forbade Fowler from being anywhere at her workplace, to which Gloria responded that she believed he could be placed on another one of SCCC's campuses. Telling Gloria that she did not understand the seriousness of the situation, the Plaintiff asked her to contact Williams so he could explain. The Plaintiff also offered to fax Gloria a copy of the Third Order, but Gloria told her she would get one from Williams.

According to the Plaintiff, she did not hear anything from SCCC for four days. Then, the Plaintiff claims, on October 19, 2009, Gloria called to inform her that SCCC intended to terminate Fowler's employment. Gloria read to the Plaintiff the letter SCCC planned to send to Fowler, which stated, in relevant part, as follows:

> It has come to our attention that one of our employees has an Order of Protection against you that includes an Order to stay away from her place of employment. This Order predates your College employment start date. As a result, your employment with the College has been terminated effective immediately. Please return your College Identification card by mail in the enclosed self-addressed stamped envelope.
> In addition, effective immediately, you are no longer permitted on Suffolk County Community College property, including all three campuses and both satellite centers. IF you are observed on College property, you will be asked to leave. Failure to comply with this request will result in a notification to the Suffolk County Police, at which time a trespass complaint may be filed.

(Cummings Aff., Exh. 19.)

According to the Plaintiff, she asked Gloria not to send the letter out because the letter indicated that Fowler was being fired because of her and the order of protection she had obtained against him. She explained to Gloria that Fowler was violent, had previously violated an order

of protection and would most like come after her as a result of the letter. Nevertheless, Gloria allegedly brushed aside the Plaintiff's concerns and told her that she had checked with SCCC's legal department, who had told her that was the form the letter had to take.

However, the Defendants offer a different version of events. According to them, they were in fact not notified by the Plaintiff about the Third Order against Fowler until October 19, 2009. They claim that on October 19, 2009, the Plaintiff called Gloria and later came to Gloria's office at Gloria's request to bring a copy of the Third Order, which, as stated above, was dated September 29, 2009, one day after Fowler was hired as a part-time proctor.

Upon receiving a copy of the Third Order from the Plaintiff, the Defendants allege that Gloria immediately drafted the termination letter. Apparently, before finalizing the letter, Gloria spoke with the Plaintiff, who asked that some of the language be changed. According to the Defendants, Gloria complied with the Plaintiff's revision requests. In the Defendants' view, the letter terminating of Fowler's employment with SCCC was necessary in light of the Third Order, which clearly prohibited Fowler from being near the Plaintiff's place of employment.

In any event, on that same day, October 19, 2009, SCCC sent the termination letter to Fowler via overnight Federal Express. On October 20, 2009, at 3:05 p.m., the letter was delivered. As Fowler later explained in his own words in a statement to police, after receiving the termination letter,

> I had enough. I drove my GMC Yukon back to [the Plaintiff's] house. Not to talk. I was so mad. I was on auto-pilot. I drove over and parked by the golf course. I then got out and walked over. I walked right to the front door and pushed it right in. I walked up the steps right to her bedroom. Her door was locked. I gave it a shove with my left shoulder and it opened. I took out my .38 revolver that I found and shot four times at her, maybe more. I don't even know if I hit her. I don't remember if she said anything

but I didn't.  I just did it and left.  I walked back to my truck and
went to drive home.

(Cummings Aff., Exh. 19.)  Fowler ultimately pled guilty to attempted murder and on June 28,

2011, was sentenced to twenty years in prison.

During the incident, Fowler shot the Plaintiff a total of ten times.  The Plaintiff suffered a

collapsed lung, a fracture to her right shoulder, grazes to her stomach and small intestines and a

severed artery in the right arm.  One of the bullets lodged itself a quarter of an inch away from

her spine.  As a result of her injuries, the Plaintiff required four blood transfusions and multiple

operations.  For example, veins from her left leg were used to reconstruct those that had been

damaged in her right arm and screws were inserted to reconnect her right arm to her right

shoulder.   At the time the Plaintiff opposed the Defendants' motion for summary judgment, she

was still attending physical therapy sessions two days per week and occupational therapy

sessions two days per week.  She was also visiting with a psychologist once per week and still

sleeps in a hospital bed with a light on every night.  Allegedly, her injuries prevent her from

typing or writing with her right hand, dancing, riding a bicycle or clapping her hands.  Because

of her diminished capacity, the Plaintiff was unable to continue to care for her youngest

daughter, who had to live with friends for a year.

## II.  DISCUSSION

### A.  Legal Standard on a Fed. R. Civ. P. 56 Motion for Summary Judgment

It is well-settled that a motion for summary judgment under Fed. R. Civ. P. 56 may be

granted by the Court only if the evidence presents no genuine issue of material fact and the

moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; see also Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) ("Rule 56(c)

provides that the trial judge shall then grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law."); Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006) ("Summary judgment is appropriate where there exists no genuine issue of material fact and based on the undisputed facts, the moving party is entitled to judgment as a matter of law.") (quoting D'Amico v. City of New York, 132 F.3d 145, 149 (2d Cir. 1998)) (internal brackets omitted). However, the Court must endeavor to resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion for summary judgment. Anderson, 477 U.S. at 247–48.

Once a party moves for summary judgment, the non-movant must come forward with specific facts showing that a genuine issue exists to avoid the motion being granted. West-Fair Elec. Contractors v. Aetna Cas. & Surety Co., 78 F.3d 61, 63 (2d Cir. 1996); see also Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (quoting Fed. R. Civ. P. 56(e)). Typically, a genuine issue of material fact exists only if "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; see Vann v. New York City, 72 F.3d 1040, 1049 (2d Cir. 1995). In addition, mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment. See Kulak v. City of New York, 88 F.3d 63, 71 (2d Cir. 1996).

**B. As to the Hostile Work Environment Claim**

At the outset, the Court notes that the standards for evaluating claims arising under Title VII and § 1983 are identical for hostile work environment, discrimination and retaliation claims. See Weinstock v. Columbia Univ., 224 F.3d 33, 42 n.1 (2d Cir. 2000); Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2, 798 F. Supp. 2d 443, 451 (E.D.N.Y. 2011)

(Spatt, J.) ("The standard for showing a hostile work environment under Title VII [and] Section 1983 . . . is essentially the same."); Carmody v. Village of Rockville Centre, 661 F. Supp. 2d 299, 324 (E.D.N.Y. 2009) (collecting Second Circuit cases); Davis v. Oyster Bay–East, No. 03–CV–1372(SJF)(JO), 2006 WL 657038, at *8, n.12 (E.D.N.Y. Mar. 9, 2006), aff'd, 220 F. App'x 59 (2d Cir. 2007) ("discrimination claims under Title VII [and] 42 U.S.C. [§] 1983 . . . are analyzed together, as the same analytic framework applies to each").  In addition, with regard to Title VII, only SCCC may be held potentially liable, because individual defendants may not be held personally liable for alleged violations of this statute.  However, under certain circumstances, an employee may be held individually liable under Section 1983.  See, e.g., Patterson v. County of Oneida, N.Y., 375 F.3d 206, 226 (2d Cir. 2004) ("[A]lthough . . . Title VII claims are not cognizable against individuals, individuals may be held liable under [§] 1983 for certain types of discriminatory acts, including those giving rise to a hostile work environment[.]") (citations omitted).

The Court will first address the Plaintiff's claim that she was subjected to unlawful discrimination and harassment in and through the creation of a severe and pervasive hostile work environment that substantially interfered with her employment, in violation of Title VII and § 1983.  As suggested above, both causes of action are subject to the same analysis.  See Smith, 798 F.Supp.2d at 451 ("The standard for showing a hostile work environment under Title VII [and §] 1983 . . . is essentially the same.").

Recently, the Second Circuit explained that "[a] hostile work environment claim requires a plaintiff to show that a workplace is 'so severely permeated with discriminatory intimidation, ridicule, and insult that the terms and conditions of her employment were thereby altered.'"

Desardouin v. City of Rochester, 708 F.3d 102, 105 (2d Cir. 2013) (quoting Alfano v. Costello, 294 F.3d 365, 373–74 (2d Cir. 2002)).  In this regard, "[t]he plaintiff must also show 'either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment.'"  Id. (quoting Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000)).  However, "[i]f a plaintiff relies on a series of incidents, they must be 'more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'"  Id. (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)).

"In considering whether a plaintiff has met this burden," the Second Circuit has offered the following guidance:

> [C]ourts should "examine the totality of the circumstances, including: the frequency of the discriminatory conduct; its severity; whether it is physical threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with the victim's job performance."  Hayut v. State Univ. of N.Y., 352 F.3d 733, 745 (2d Cir. 2003) (quotation mark omitted).  Moreover, the "test has objective and subjective elements: the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment, and the victim must also subjectively perceive that environment to be abusive."  Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (quotation marks omitted).  Of course, "it is axiomatic that mistreatment at work, whether through subjection to a hostile work environment or through other means, is actionable under Title VII only when it occurs because of an employee's . . . *protected characteristic*," such as race[.]  Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001) (emphasis added).

Rivera v. Rochester Genessee Regional Transp. Authority, 702 F.3d 685, 693–94 (2d Cir. 2012) (emphasis and parentheticals in the original; original brackets omitted).  Thus, in other words, when bringing a hostile work environment claim, a plaintiff has three requirements, namely an objective requirement, a subjective requirement, and a prohibited causal factor requirement.

Brown v. Henderson, 257 F.3d 246, 252 (2d Cir. 2001); Gregory v. Daly, 243 F.3d 687, 691–92 (2d Cir. 2001).

In the present case, viewing the evidence in the light most favorable to the Plaintiff, the Plaintiff accuses Canniff and/or Britton of (1) often referring to African-Americans as "you people"; (2) expressing skepticism that the Plaintiff completed her doctorate in three years; (3) calling the Plaintiff "young lady" or "Michelle" instead of her professional title; (4) suggesting that African-Americans were "taking over" SCCC, in reference to SCCC's African-American President, Vice President and two executive deans; (5) remarking that Green was smart but "just happened to be black"; (6) suggesting to the Plaintiff that although Manning "looked like you people," he was "one of us"; (7) indicating that Caucasians "got the hell out of" Mount Vernon, New York when African-Americans moved in; (8) implying that a "fat black woman" would be threatened by "a skinny black woman" and (9) making negative comments about the President of SCCC, who was an African-American woman. However, in the Court's view, this record is insufficient, as a matter of law, to permit a reasonable fact finder to identify a hostile work environment which altered the Plaintiff's conditions of employment.

In this regard, "[w]hile subjectively [the Plaintiff] may well have felt pressure, in-hospitability, and humiliation, there is insufficient objective evidence to support a reasonable conclusion that these occurrences were the product of discriminatory intent, or, taken together, were severe enough to permeate [her] workplace with discriminatory intimidation." Craig v. Yale University School of Medicine, Civil No. 3:10CV1600(JBA), 2013 WL 789718, at *14 (D. Conn. Mar. 4, 2013). For instance, although the Court acknowledges that some of the alleged conduct by Britton and Canniff was racist and inappropriate, the use of "you people" may not in

and of itself be racist, nor is calling the Plaintiff "young lady" or "Michelle" instead of her professional title.

Moreover, although the Plaintiff claims that Britton constantly complained about Pippin, the SCCC president, nowhere does the Plaintiff allege that his criticism had anything to do with Pippin's race. In addition, there is nothing to indicate that Canniff's questioning of the Plaintiff's doctorate degree was racially-motivated and the "Plaintiff's subjective belief that [it was] racially-motivated is not sufficient to create a genuine issue of material fact with respect to whether [the Defendants] created a hostile work environment or harassed Plaintiff." Cadet v. Deutsche Bank Securities Inc., No. 11 Civ. 7964(CM), 2013 WL 3090690, at *10 (S.D.N.Y. June 18, 2013). While the Plaintiff suggests that a while faculty member who also finished her doctorate degree in three years was not similarly questioned by Canniff, the Plaintiff fails to provide any evidence that she and the white faculty member were similarly situated, such as whether they had been enrolled in comparable doctoral programs.

However, even assuming that all the purported statements attributed to Britton and Canniff were based upon the Plaintiff's race, case law suggests that their conduct would not be enough to sustain the Plaintiff's hostile work environment claim. This is because "[f]or racist comments, slurs and jokes to constitute a hostile work environment . . . there must be a steady barrage of opprobrious racial comments. Although there is no threshold magic number of harassing incidents that give rise to a hostile work environment claim, as a general rule, incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." Curcio v. Roosevelt Union Free School Dist., No. 10–CV–5612 (SJF)(AKT), 2012 WL 3646935, at *11 (E.D.N.Y. Aug. 22, 2012) (quoting Arroyo v. New York

Downtown Hosp., No. 07 CV 4275(RJD)(LB), 2010 WL 3861071, at *6 (E.D.N.Y. Sept. 28, 2010)); see also Davis–Bell v. Columbia Univ., 851 F. Supp. 2d 650, 673 (S.D.N.Y. 2012) (quoting Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997)) ("For 'racist comments, slurs, and jokes' to be actionable as a hostile work environment, there generally 'must be more than a few isolated incidents of racial enmity[.]'").

Here, none of the alleged comments by Britton or Canniff were especially abhorrent or inflammatory, nor did they involve physical threats or egregious language, slurs or epithets. Moreover, nothing in the record suggests that Canniff's and Britton's conduct was anything more than episodic, as the Plaintiff only raises a handful of specific incidents over the course of her more than ten years of employment. Davis–Bell, 851 F. Supp. 2d at 673 ("Here, the nine incidents that Plaintiff claims created her hostile work environment are episodic and isolated, spread out over four years. They are not continuous enough to be considered 'pervasive' by a rational juror."). Indeed, "[a]lthough the alleged statements may have been crude and racially insensitive, they were not sufficiently 'severe' or 'pervasive' to alter the conditions of plaintiff's working environment." Curcio, 2012 WL 3646935, at *11. See also Cadet, 2013 WL 3090690, at *2, 10–11 (dismissing the plaintiff's hostile work environment claim at the summary judgment stage where, over the course of three years, the plaintiff's alleged that his supervisors singled him out because of his race and that one of his supervisors (1) stated that Martin Luther King Day was "only a holiday for some people"; (2) made a clenched-fist gesture in reference to the Black Power movement when the plaintiff stated what his racial ethnicity was at a work-related dinner; and (3) stated that he was "100% white" and that his dark skin was a result of him "being exposed to too much sun when he was a boy").

Therefore, because the Court finds that as a matter of law there was no hostile work environment, the Court need not analyze whether these claims may be imputed to either the employer or to either of the individual defendants. Accordingly, to the extent the Plaintiff's Title VII and § 1983 claims are premised on a hostile work environment theory, the Defendants' motion for summary judgment is granted and such claims are dismissed.

## C.  As to the Discrimination Claim

As with a hostile work environment claim, generally "discrimination claims under Title VII [and §] 1983 . . . are analyzed together, as the same analytic framework applies to each[.]" Davis v. Oyster Bay–East, No. 03–CV–1372 (SJF)(JO), 2006 WL 657038, at *8 n.12 (E.D.N.Y. Mar. 9, 2006), aff'd, 220 F. App'x 59 (2d Cir. 2007); see also Walker v. New York City Dep't of Corrections, No. 01 Civ. 1116(LMM), 2008 WL 4974425, at *12 (S.D.N.Y. Nov. 19, 2008) ("This court considers the Title VII . . . and § 1983 discrimination claims together, as the Second Circuit applies the same analysis to these claims.") (collecting cases).  Here, the Plaintiff accuses the Defendant SCCC and Canniff of discriminating against her based on race when they decided to hire McIntosh instead of her for the position of Associate Dean of Instructional Technology.

To succeed on a claim of employment discrimination, the Plaintiff must first establish a prima facie case of discrimination.  Ruiz v. County of Rockland, 609 F.3d 486, 491 (2d Cir. 2010).  To do this, the Plaintiff must show that "(1) [s]he is a member of a protected class; (2) [s]he was qualified for the position [s]he held; (3) [s]he suffered an adverse employment action; and (4) the adverse action took place under circumstances giving rise to an inference of discrimination."  Id. at 491–92; see also Leibowitz, 584 F.3d at 498.  With regard to the fourth prong of this test, the Second Circuit has held that an inference of discrimination may be drawn

either from (1) direct evidence of discriminatory intent, or (2) a showing by the Plaintiff that "she was subjected to disparate treatment . . . [compared to persons] similarly situated in all material respects to . . . herself." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000) (internal quotations and citations omitted).

Provided the Plaintiff demonstrates these elements, thereby establishing a prima facie case of discrimination, the burden then shifts to the Defendant to articulate a legitimate, nondiscriminatory reason for their actions. Ruiz, 609 F.3d at 492. If the Defendants carry this burden, the burden shifts back to the Plaintiff to introduce evidence that the Defendants' explanations are pretextual. Id. In order to satisfy her burden at the final stage, the Plaintiff must offer "hard evidence, not conclusory supposition[,] that the [D]efendant[s'] articulated rationale is a pretext for discrimination." Schanfield v. Sojitz Corp. of America, 663 F. Supp. 2d 305, 329 (S.D.N.Y. 2009) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 804, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)). "A reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." Id. (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993)) (emphasis in original). In this way, "[t]he ultimate burden of persuading the trier of fact that the [D]efendant[s] intentionally discriminated against the [P]laintiff remains at all times with the [P]laintiff." Yu v. N.Y. City Hous. Dev. Corp., 494 F. App'x 122, 125 (2d Cir. 2012) (quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

In this case, the Court finds that the Plaintiff has not established a prima facie case of discrimination, since it appears she cannot demonstrate that the selection of McIntosh over her

occurred under circumstances giving rise to an inference of discrimination. However, even assuming that the Plaintiff has made out a prima facie case, the Court finds that the Defendants have satisfied their burden of articulating a nondiscriminatory reason for their hiring decision, and the Plaintiff has failed to proffer any evidence that would indicate that their explanation is actually pretextual.

In this regard, the Plaintiff theorizes that the Defendants SCCC and Canniff discriminated against her based on (1) the fact that the candidate they chose for the position was a white male; (2) Green's alleged comment, as relayed by the Plaintiff, that she witnessed blatant racism by the committee during the selection process; and (3) her belief that there was no other reason for the Defendants not to hire her besides her race. As an initial matter, with respect to Green's alleged comment, this statement is "inadmissible hearsay the Court cannot consider on summary judgment." Allen v. Schiff, 908 F. Supp. 2d 451, 459 (S.D.N.Y. 2012) (citing Fed. R. Civ. P. 56(c)(4)). See also Aspilaire v. Wyeth Pharmaceuticals, Inc., 612 F. Supp. 2d 289, 302 (citing Sarno v. Douglas Elliman-Gibbons & Ives, Inc., 183 F.3d 155, 160 (2d Cir. 1999)) ("As the statements upon which plaintiff relies are not supported by any affiants with first-hand knowledge, such statements are hearsay and, thus, not proper for this Court to consider on a motion for summary judgment."). In any event, even if the Court were to consider Green's statement, it is merely a generalized and speculative statement without any specific details demonstrating how or why the committee was allegedly racist during the selection process.

Moreover, although the Plaintiff questions McIntosh's qualifications and praises her own, "[t]o prevent summary judgment where a promotion was awarded based on a comparison of applicants' qualifications, a plaintiff must show that [her] credentials were 'so superior to the

credentials of the person selected for the job that 'no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" Johnson v. City of New York Dep't of Parks and Recreation, No. 09–CV–3980 (RRM)(LB), 2013 WL 878821, at *3 (E.D.N.Y. Mar. 8, 2013) (quoting Byrnie v. Town of Cromwell, Bd. of Educ., 243 F.3d 93 (2d Cir. 2001)); see also Albjua v. Natioanl Broadcasting Co. Universal, Inc., 851 F. Supp. 2d 599, 612 (S.D.N.Y. 2012). Further, "[a] plaintiff must, inter alia, prove by a preponderance of the evidence that the failure to promote was actually motivated in whole or in part by unlawful discrimination," which means "there must be proof that the plaintiff was rejected under circumstances which give rise to an inference of unlawful discrimination." Id. (quoting Hawkins v. 1115 Legal Serv. Care, 163 F.3d 684, 694 (2d Cir. 1998), and Aulicino v. New York City Dep't of Homeless Services, 580 F.3d 73, 80 (2d Cir. 2009)).

Here, the Plaintiff has not demonstrated that her credentials were so superior to McIntosh that no reasonable person would have selected McIntosh for the position over her. McIntosh had a master's degree in a technology-related field and although he did not yet possess a doctorate degree like the Plaintiff, he was in the process of earning his doctorate degree, which he anticipated would be completed by spring of 2008. Given that McIntosh was merely months away from completing his doctorate when the hiring process began in October 2007, SCCC's decision to hire him over the Plaintiff was not unreasonable nor did it run counter to SCCC's goal to increase doctoral-degree holders among its faculty, since in all likelihood, McIntosh would have completed his doctorate by the time he started the position.

Further, while the Plaintiff attempts to diminish McIntosh's doctorate degree as only being in "humanistic studies," a review of McIntosh's resume shows that (1) his research interests were "[o]nline, course-based instructor-student communication, observed through use of discourse and conversation analysis technique"; (2) the focus of his research was "Immediacy and Social/Teaching Presence"; (3) his doctorate project involved "[c]ompar[ing] instructors teaching [face-to-face] and online sections of same course yet using differing modes of communication" and (4) the question his doctorate project aimed to answer was "what strategies and methods do professors use to communicate in their traditional and online teaching and learning environments to establish and maintain channels of communication both with individual students and the learning community?" (Cummings Aff., Exh. 2.) As such, his doctoral work was extremely relevant to the position of Associate Dean of Instructional Technology.

His resume also indicates that at the time he applied for the job at SCCC, he had been working as a Coordinator of Instructional Technology at Schenectady County Community College for approximately eight years. In that position, McIntosh was responsible for distance education. He also worked as an Adjunct Instructor at Schenectady County Community College. Further, he had relevant experience serving on the SUNY Advisory Council for Economic Development Internet Information Portal and as the chairman for the SUNY FACT Advisory Council and Committee. It was this experience in particular, which involved direct work experience with the SUNY Provost, that the Defendant SCCC highlights as something the committee particularly valued. Conversely, the Plaintiff did not have comparable experience.

The Defendants also point to the Plaintiff's cover letter, which contains errors. Indeed, the Court finds that the cover letter contained a number of mistakes, which, in the Court's view,

in many settings, would result in immediate disqualification of a job candidate. The fact that the committee decided to interview the Plaintiff despite these errors in the Plaintiff's initial application letter is another indication that the committee was not biased against her based on race.

With that being said, it clearly appears that the evidence shows that while the Plaintiff may have been qualified for the position of Associate Dean of Instructional Technology, McIntosh was at least equally qualified. Moreover, the Defendants have articulated nondiscriminatory reasons for their hiring decision, including valuing aspects of McIntosh's work experience as to which the Plaintiff did not have comparable experience. See Sibilla v. Follet Corp., No. CV 10–1457(AKT), 2012 WL 1077655, at *15 (E.D.N.Y. Mar. 30, 2012 ("Where an employer's explanation, offered in clear and specific terms, is reasonably attributable to an honest even though partially subjective evaluation of . . . qualifications, no inference of discrimination can be drawn.") (quoting Byrnie, 243 F.3d at 105) (internal quotation marks omitted). Except for Green's inadmissible and speculative hearsay statement, the Plaintiff has presented no evidence indicating that the committee's decision was motivated by race beyond her own conclusory allegations. See Ruszkowski v. Kaleida Healthy Sys., 422 F. App'x 58, 60 (2d Cir. 2011) ("A plaintiff cannot establish a prima facie case based on 'purely conclusory allegations of discrimination, absent any concrete particulars.'") (quoting Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.1985)).

Indeed, the summary judgment record indicates that the hiring process was multi-stepped with no evidence of racial bias. It involved a search committee of nine members, who reviewed and scored resumes, interviewed candidates and ultimately conducted a secret ballot to rank the

Plaintiff and McIntosh, who were the two finalists for the position. Then, after the committee made its recommendation to Canniff, he reviewed the resumes of the Plaintiff and McIntosh and interviewed them. He too concluded that McIntosh was the best candidate for the position and sent his recommendation to the SCCC president, who made the final decision to hire McIntosh. Finally, after McIntosh was selected, the selection process was internally reviewed and no bias was uncovered. The Plaintiff has pointed to not one piece of evidence that would imply the existence of any racial discrimination in the hiring process. See Garcia v. Henry Street Settlement, 501 F. Supp. 2d 531, 545 (S.D.N.Y. 2007) ("[M]ere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment." ).

Accordingly, "[t]he court must respect the employer's unfettered discretion to choose among qualified candidates." Parikh v. New York City Transit Authority, 681 F. Supp. 2d 371, 378 (E.D.N.Y. 2010) (quoting Byrnie, 243 F.3d at 103) (internal brackets omitted). It clearly would not have been unreasonable for the Defendants to select McIntosh over the Plaintiff. Therefore, the Plaintiff's discrimination cause of action based on a failure to promote cannot survive summary judgment and the Court grants Defendants' motion with respect to this claim. See Johnson, 2013 WL 878821, at *5 ("An 'employer need not prove that the person promoted had superior objective qualifications, or that it made the wisest choice, but only that the reasons for the decision were nondiscriminatory.'") (quoting Davis v. State Univ. of New York, 802 F.2d 638, 641 (2d Cir. 1986)).

**D.  As to the Retaliation Claim**

The Plaintiff also brings a retaliation claim against the Defendant SCCC pursuant to Title VII and § 1983. According to the Plaintiff, SCCC retaliated against her for filing her

discrimination action against it by hiring Fowler, her estranged and violent husband, to work as a part-time proctor at SCCC and then by terminating him in such a way so that he would blame the Plaintiff.

Both a Title VII claim and a § 1983 claim for retaliation are analyzed pursuant to the familiar three-step burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. at 802, and thus both claims will be assessed simultaneously. In summary form, the McDonnell Douglas test requires that, first, the Plaintiff establish a prima facie case of retaliation. See El Sayed v. Hilton Hotels Corp., 627 F.3d 931, 932–33 (2d Cir. 2010) (describing the McDonnell Douglas burden shifting test in the context of a retaliation claim). To establish a prima facie case of retaliation, the Plaintiff must:

> adduce evidence sufficient to permit a rational trier of fact to find (1) that he engaged in protected [activity] under [the anti-discrimination statutes], (2) that the employer was aware of this activity, (3) that the employer took adverse action against the [P]laintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action.

Kessler v. Westchester Cty. Dep't of Soc. Servs., 461 F.3d 199, 205–06 (2d Cir. 2006). If there is no direct evidence of retaliatory animus, proof of causation may be shown indirectly, such as by demonstrating temporal proximity between the protected conduct and the alleged retaliatory action. Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000); Cifra v. GE, 252 F.3d 205, 217 (2d Cir. 2001) ("[T]he causal connection needed for proof of a retaliation claim 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'") (quoting Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (internal citation omitted)). Then, if the Plaintiff establishes a prima facie case of

retaliation, the burden shifts to the Defendant to produce a non-retaliatory reason for the allegedly adverse action.  <u>Id.</u>

Finally, if the Defendant satisfies this burden of production, the Plaintiff again has the burden of showing, through more than mere temporal proximity, that "more likely than not the employer's decision was motivated, at least in part, by an intent to retaliate against [her]."  <u>El Sayed</u>, 627 F.3d at 933 ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy [a plaintiff's] burden to bring forward some evidence of pretext."); <u>see</u> <u>Patterson v. County of Oneida, N.Y.</u>, 375 F.3d 206, 221 (2d Cir. 2004) (noting that the burden shifts back to the plaintiff to demonstrate by competent evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.").

If a retaliatory motive played any part in the adverse employment action, even if there were other objectively valid grounds, the law is violated.  <u>Sumner v. U.S. Postal Serv.</u>, 899 F.2d 203, 209 (2d Cir. 1990) (citing <u>Davis v. State Univ. of N.Y.</u>, 802 F.2d 638, 642 (2d Cir. 1986)). However, "once the employer has proffered its nondiscriminatory reason, the employer will be entitled to summary judgment . . . unless the [P]laintiff can point to evidence that reasonably supports a finding of prohibited discrimination."  <u>James v. N.Y. Racing Ass'n</u>, 233 F.3d 149, 154 (2d Cir. 2000) ("once the employer has proffered a reason for its action, all presumptions and special rules drop away; a case under Title VII becomes like any other case in that the plaintiff, in order to prevail, must have evidence from which the factfinder can reasonably find the essential elements of the claim").  In order to meet this burden, the Plaintiff may rely on

evidence presented to establish his prima facie case, as well as additional evidence such as direct or circumstantial evidence of retaliation. Desert Palace, Inc. v. Costa, 539 U.S. 90, 99–101, 123 S. Ct. 2148, 156 L. Ed. 2d 84 (2003); LaFond v. Gen. Physics Servs. Corp., 50 F.3d 165, 174 (2d Cir. 1995) ("Pretext may be demonstrated either by the presentation of additional evidence showing that 'the employer's proffered explanation is unworthy of credence,' or by reliance on the evidence comprising the prima facie case, without more . . . .") (internal citation and quotation omitted).

As to the hiring of Fowler, the Court finds that the Plaintiff's retaliation claim based on this fact cannot survive the Defendants' motion for summary judgment. Viewing the evidence in the light most favorable to the Plaintiff, the summary judgment record indicates that Green was the one responsible for hiring Fowler, despite knowing about the previous orders of protection and the past domestic violence incidents between him and the Plaintiff. The Plaintiff has presented no evidence indicating that Green had any sort of retaliatory motive against the Plaintiff for her filing the discrimination action when she hired Fowler. In fact, the Plaintiff's own version of events suggests that Green was friendly with Fowler and was simply trying to do him a favor for helping her out with her house. Further, as SCCC explained in its motion papers, the Plaintiff did not obtain the Third Order – which barred Fowler from being at her workplace – until after Fowler was hired and once it learned of the existence of the Third Order, SCCC proceeded to terminate his employment as a part-time proctor.

To the extent the Plaintiff relies on the temporal proximity between the serving of her Complaint on September 9, 2009 and the hiring of Fowler on September 28, 2009, the Court emphasizes that "[b]ecause there is no evidence in the record, viewed in the light most favorable

to the [P]laintiff, besides temporal proximity from which the jury could infer retaliation, a reasonable jury could not find that the [hiring of Fowler] was a retaliatory act or that [the] [D]efendant's explanation was pretext." Levitant v. City of New York Human Resources Admin., 914 F. Supp. 2d 291, 299 n.12 (E.D.N.Y. 2012) (citing El Sayed, 627 F.3d at 933). As already stated, outside of temporal proximity, the Plaintiff has failed to proffer any evidence demonstrating that the hiring of Fowler was a retaliatory act for the Plaintiff commencing this discrimination lawsuit.

As to the method by which Fowler was terminated, the Court finds that questions of fact exist that would normally preclude the granting of summary judgment. In this regard, both the Plaintiff and Gloria provide different versions of events concerning the drafting of the termination letter that was ultimately sent to Fowler. However, even presuming that the Plaintiff's version of events was undisputed, the Plaintiff's retaliation claim still fails because the Plaintiff again only relies on temporal proximity to establish retaliation.

In this regard, although the Plaintiff may have relayed her concerns about the termination letter to Gloria, there is no indication that these concerns ever reached the Legal Department, who made the determination about the form the termination letter should take. A review of the termination letter reveals that, understandably, the Legal Department's goal was not just to terminate Fowler's employment, but to also ensure that he never returned to any of SCCC's property, as he would be in violation of the Third Order. In order to accomplish this goal, SCCC was required to discuss the Third Order in the termination letter.

SCCC has offered an explanation for why it sent out the letter in the fashion it did – that is, to make sure it was in complete compliance with the Third Order of Protection the Plaintiff

had obtained against Fowler – and the Plaintiff can point to no other evidence of retaliatory motive or pretext beyond temporal proximity. Therefore, the Court must grant summary judgment in favor of the Defendants. See Workneh v. Pall Corp., 897 F. Supp. 2d 121, 135 (E.D.N.Y. 2012) ("Plaintiff provides no direct evidence of retaliation sufficient to establish a causal nexus between his discrimination claims and alleged adverse actions. And temporal proximity, without more, is insufficient to create an inference of retaliation. Therefore, the Title VII retaliation claims are dismissed."); Robinson v. Zurich North America Ins. Co., 892 F. Supp. 2d 409, 435–36 (E.D.N.Y. 2012) ("Even assuming that plaintiff's prima facie case of retaliation could be established by temporal proximity, the defendants have articulated legitimate, non-discriminatory reasons for [their actions], and 'temporal proximity is insufficient to satisfy [plaintiff's] burden to bring forward some evidence of pretext.' Plaintiff must 'come forward with some evidence of pretext in order to raise a triable issue of fact. . . . [P]laintiff has failed to produce evidence from which a rational jury could conclude that defendants' proffered reasons are pretext for retaliatory animus. Thus, plaintiff's retaliation claims cannot survive summary judgment.") (quoting El Sayed, 627 F.3d at 933). Accordingly, the Plaintiff's retaliation claim is also dismissed.

### III. CONCLUSION

For the foregoing reasons, it is hereby

**ORDERED**, that the Defendants' motion for summary judgment is granted in its entirety. The Plaintiff's complaint is dismissed and the Clerk of the Court is directed to close this case.

**SO ORDERED**.

Dated: Central Islip, New York
        November 4, 2013

                                        _____/s/ Arthur D. Spatt_____
                                           ARTHUR D. SPATT
                                        United States District Judge